

Gregory K. McGillivary
gkm@mselaborlaw.com

McGillivary
Steele
Elkin LLP

October 31, 2022

<u>VIA ECF</u>
Hon. Paul G. Gardephe
United States District Court
Southern District of New York
500 Pearl Street, Room 2204
New York, NY 10007

     Re:    *Williams et. al. v. City of New York*, Case No. 1:16-cv-08671

Dear Judge Gardephe:

Plaintiffs respectfully submit this letter on behalf of all Parties regarding the proposed Settlement Agreement ("Agreement" or "Settlement") between the Plaintiffs and the Defendant, the City of New York ("Defendant" or "City"), in the above-referenced case brought under the Fair Labor Standards Act ("FLSA"). For the reasons set forth below, the Settlement is a fair and reasonable resolution of a *bona fide* dispute and should be approved. The signed Settlement Agreement (Exhibit 1), and a Proposed Order (Exhibit 2) are attached, along with supporting declarations from Plaintiffs' Counsel, Gregory K. McGillivary (Exhibit 3) and Hope Pordy (Exhibit 4). Pursuant to Paragraph 8.1 of the Agreement, should the Court deem a settlement approval conference necessary, the Parties request that a telephonic conference be set within the next 30 days at a time convenient to the Court.[1]

The Plaintiffs—1,740 individuals employed or formerly employed by the Defendant as Child Protective Specialists ("CPS") and Child Protective Specialist Supervisors ("CPSS") —have been fully informed of the terms of the Settlement and have been provided with an opportunity to review the Agreement. ***To date, there have been no objections to the Settlement.*** The Parties now submit the Settlement Agreement for the Court's consideration pursuant to *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015), and *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020).

## I.    Claims Asserted and Procedural History

This case was filed in federal court on November 8, 2016, as a related matter to *Foster v. City of New York*, 1:14-cv-4142-PGG. Specifically, the case involves the same claims asserted in *Foster* for CPS and CPSS who did not join the original *Foster* lawsuit.

---

[1] Should the Court schedule a Conference, Plaintiffs' Counsel will notify all Plaintiffs of the date and time.

Hon. Paul G. Gardephe
October 31, 2022
Page 2

Exactly as in *Foster*, the *Williams* Plaintiffs allege that Defendant violated the FLSA as follows:

1) Defendant failed to compensate Plaintiffs for pre-shift and post-shift work captured in the Defendant's timekeeping system, CityTime ("Uncompensated Pre- and Post-Shift Overtime Claim");

2) Defendant failed to compensate Plaintiffs for overtime work performed during Plaintiffs' unpaid meal period ("Meal Period Claim");

3) Defendant failed to properly calculate the regular rate of pay in violation of the FLSA by failing to include night shift differentials and meal allowances in the calculation of the rate at which overtime was paid ("Regular Rate Claim");

4) Defendant failed to pay overtime at the rate of one and one-half times the regular rate of pay in violation of the FLSA by compensating Plaintiffs for hours in excess of 40 in a workweek with compensatory time or cash at a straight time rate ("Straight Time Claim"); and

5) Defendant failed to pay overtime in a timely fashion ("Late Payment of Overtime Claim").

Plaintiffs also allege that Defendant's conduct lacked good faith and reasonableness, thus entitling Plaintiffs to liquidated damages in an amount equal to their backpay, and that Defendant willfully violated the law, thereby extending the statute of limitations from two to three years under 29 U.S.C. § 255(a).

As noted above, this case is related to *Foster v. City of New York,* Case No. 1:14-cv-4142-PGG, as it addresses nearly ***identical*** legal issues and involves different individuals in the same job titles as *Foster*. *See* Dkt. 8 (Related Case Statement). In light of this, the Court entered a stay in this case pending the resolution of the related *Foster* matter. (Dkt. 26).

In Foster, after extensive discovery, on September 30, 2017, the Court issued a decision granting Plaintiffs' Motion, in part, and holding that Defendants:

- failed to pay Plaintiffs for compensable work performed before and after the Plaintiffs' shifts and during their meal periods;

- failed to include night shift differential and meal allowance payments in the regular rate of pay for purposes of calculating overtime;

- failed to pay compensatory time at a rate of time-and-one-half for all hours worked over 40 in a workweek

Dkt. 153. The Court denied Defendant's summary judgment motion in whole. However, the Court found that disputes of fact required a trial on Plaintiffs' Late Payment of Overtime Claim. *Id.* at 72.

In addition, in *Foster*, the Court ruled that Plaintiffs were similarly situated—permitting the use of representative testimony at trial. *Foster* was set for a jury trial in January 2022 on the following issues: damages, specifically, the amount of uncompensated work performed, whether the City violated the FLSA's prompt payment requirements, whether the City willfully violated

Hon. Paul G. Gardephe
October 31, 2022
Page 3

the law thus extending the statute of limitations, and the measure of backpay damages owed. *See id.* at Dkt. 231. However, prior to trial, the Parties resolved the *Foster* case through a settlement, which was approved by the Court on December 28, 2021. *Id.* at Dkt. 242.

Following resolution of *Foster*, on March 9, 2022, the Parties jointly requested that the Court lift the stay in this matter, set a deadline for Plaintiffs to file consent-to-sue forms for additional party-plaintiffs, and set a schedule for limited discovery to facilitate settlement. Dkt. 53. On April 7, 2022, the Court held an initial case management conference and discussed the Parties' proposed Civil Case Management Plan setting forth a schedule for settlement discussions, and in the event that settlement discussions were unsuccessful, for fact and expert discovery. Dkt. 58; Dkt. 61. The Court entered a Civil Case Management Plan focused on settlement discovery followed by fact and expert discovery (if necessary) and ordered the Parties to provide biweekly status updates on their progress towards settlement. Dkt. 61-62.

As part of settlement-related discovery, the City provided pay and CityTime data for the Plaintiffs in this matter. The Plaintiffs' expert prepared damages calculations, which Plaintiffs provided to the City's expert for review, along with a proposal for resolution using the same settlement framework as *Foster*. Following additional settlement discussions and Court conferences on July 28, September 20, and October 7, the Parties reached a settlement in principle to resolve this matter on October 19, 2022. Dkt. 95. That settlement was reduced to writing and signed by the parties on October 31, 2022.

## II.    Terms of the Proposed Settlement Agreement

The Agreement provides that Defendant will pay $25,856,690.00 ("Settlement Amount") to resolve the lawsuit. The Settlement Amount will be paid as follows: (1) $13,943,967.00 in backpay ("the Backpay Amount") by checks made payable to each Plaintiff (via direct deposit for current employees or by check delivered to Plaintiffs' Counsel for separated employees) in the amount of each Plaintiff's share as determined by Plaintiffs' Counsel; and (2) one check in the amount of $11,912,723.00 constituting liquidated damages, attorneys' fees, litigation expenses and Service Awards payable to Plaintiffs' Counsel for distribution to Plaintiffs ("Lump Sum Amount").

Plaintiffs and their Counsel have an agreement regarding the distribution[2] of the Lump Sum Amount which is reflected in the Agreement. The Lump Sum Amount will be distributed as follows: (1) $4,129,777.90 in net liquidated damages; (2) $4,500.00 in service awards ("the Service Award Amount") to the three named Plaintiffs who also served as Settlement Team Members each receiving $1,500.00; (3) $30,625.85 in out-of-pocket expenses to Plaintiffs' Counsel; and (5) a 30% contingency fee to Plaintiffs' Counsel in the amount of $7,747,819.25 calculated after expenses are deducted. Each Plaintiff individually agreed, in writing, to a 30% contingency fee when they retained the law firms.

---

[2] Defendant takes no position regarding the distribution of the Lump Sum Amount as the distribution amounts were determined solely by Plaintiffs' Counsel pursuant to their agreement with Plaintiffs.

Hon. Paul G. Gardephe
October 31, 2022
Page 4

     The Backpay Amount and net liquidated damages portion of the Settlement Amount were calculated by Plaintiffs' Counsel and will be divided among the Plaintiffs as follows (and based on the same methodology used in *Foster*):  For each week that a Plaintiff worked as a CPS or CPSS ("covered title") during the recovery period, the Plaintiff received one point.[3]

     The recovery period for each Plaintiff is three years prior to the date a Plaintiff's consent-to-sue form was filed in Court up to October 31, 2022, or their last day of employment, whichever is earlier. The points were then divided into $18,073,744.90 ("Net Settlement Fund"), to determine the dollar value of a point. The Net Settlement Fund is the Backpay Amount and liquidated damages after attorneys' fees, litigation expenses, and Service Awards are deducted. Exhibit A to the Settlement lists Plaintiffs' distribution amounts after attorneys' fees and expenses are deducted.[4]

---

[3] The methodology of using weeks of employment during the relevant statute of limitations period to determine the Plaintiffs' amounts is the methodology used in other FLSA cases involving complicated off-the-clock claims and a variety of different claims wherein the risks and valuations of each claim and the amounts of work time the Plaintiffs may win are difficult to separately quantify for each Plaintiff and for each claim. *E.g., De La Cruz v. City of New York,* Case No. 14-CV-9220-PGG, Dkt. 227 (July 1, 2022); *Foster* Dkt. 242 (Dec. 28, 2021)*, Matias v. City of New* York, Case No. 21-cv-1736-GHW Dkt. 39 (October 29, 2021) (approving settlement agreement for School Safety Agent Level 3 title at NYPD using same distribution methodology); *Campbell v. City of New York,* Case No. 16-cv-8719 (AJN) (SDA), Dkt. 186, (S.D.N.Y. Sept. 17, 2021) (approving settlement agreement for DHS security officers using same distribution methodology); *Murray et al., v. City of New York;* Case No. 1:16-cv-08072 (PKC), Dkt. 228 (S.D.N.Y. Apr. 23, 2021) (approving settlement agreement for various administrative titles at DHS using same distribution methodology); *Lawtone-Bowles et al., v. City of New York,* Case No. 1:16-cv-04240 (AJN) (OTW), Dkt. 157 (S.D.N.Y. Apr. 8, 2021) (approving settlement agreement for DHS motor vehicle operators using same distribution methodology); *Bookman et al., v. City of New York*, Case No. 1:18-cv-04338 (AJN) (OTW), Dkt. 102 (S.D.N.Y. Apr. 8, 2021) (same); *Worley et al., v. City of New York*, Case No. 1:17-cv-04337 (LGS), Dkt. 230 (S.D.N.Y. Jun. 8, 2020) (approving settlement agreement for NYPD school safety agents using same distribution methodology); *Perry v. City of New York*, Case No. 1:13-cv-01015 (VSB) (S.D.N.Y. Feb. 13, 2020) (approving settlement agreement for FDNY Fire Inspectors using same distribution methodology); *Jones v. New York City Housing Authority*, No. 1:17-cv-3683 (JGK) (S.D.N.Y. Dec. 17, 2018) (approving FLSA settlement agreement for NYCHA housing assistants using same distribution method); *Brown v. New York City Housing Authority*, Case No. 1:16-cv-9263(RA) (S.D.N.Y. Sep. 14, 2018) (approving FLSA settlement agreement for 856 NYCHA maintenance workers and heating plant technicians using same distribution method); *Johnston v. New York City Housing Authority,* Case No. 1:16-cv- 9924 (S.D.N.Y. Jan. 19, 2018) (approving settlement agreement using same distribution methodology at issue here for NYCHA Exterminators); *Small v. City of New York,* Case No. 1:14-cv-3469 (S.D.N.Y. May 15, 2015) (approving settlement of FLSA claims by NYPD police sergeants using same distribution methodology used here); *Mullins v. City of New York*, Case No. 1:06 cv 20238 (SAS) (same).

Hon. Paul G. Gardephe
October 31, 2022
Page 5

As reflected in Paragraph 2.4 of the Agreement, Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to thirty percent (30%) of the Settlement Amount calculated after litigation expenses are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $7,747,819.25 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel. The contingent fee percentage and the methodology used to determine the Plaintiffs' amounts are identical in this case to the contingent fee percentage and the methodology used in the related *Foster* case that this Court approved on December 28, 2021.

In consideration and exchange for this Settlement, the Plaintiffs agree to release the Defendant for all wage and hour claims through October 31, 2022.

Each Plaintiff has been informed, in writing, of the methodology for assigning points, the value of a point, and the number of points calculated for them using the Defendant's payroll data. Each Plaintiff has been given an opportunity to dispute the number of points assigned and to review the point assignments and settlement awards of all other Plaintiffs. To date, there have been no unresolved disputes or objections. The reaction of the collective has been nothing but positive.

### III.    Applicable Factors for Approving FLSA Settlements

A settlement in an FLSA collective action is not effective unless it is approved by either a district court or the United States Department of Labor. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020); *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015). "As a result, district courts in this Circuit routinely review FLSA settlements for fairness before approving any stipulated dismissal." *Id.* "Generally, there is a strong presumption in favor of finding a settlement fair, because the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (internal quotation marks omitted).

"In determining whether to approve proposed FLSA collective action settlements, courts are mindful of the fact that 'FLSA collective actions do not implicate the same due process concerns as Rule 23 actions.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862, at *5 (E.D.N.Y. 2011). Unlike Rule 23 class actions where failure to affirmatively opt-out results in a class member being bound by an approved class settlement, in an FLSA action like this one, an eligible individual who decides *not* to join is not a party to the case, and as such, is not bound in any way by the settlement agreement, or the final judgment in a case. As such, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes.'" *Beckman*, 293

---

[4] Plaintiffs have until November 11, 2022, to review their settlement allocation and to lodge any disputes. Should any valid dispute be submitted to Plaintiffs' Counsel requiring an adjustment to the points, Plaintiffs will file a revised Exhibit A with the Court by November 14, 2022.

Hon. Paul G. Gardephe
October 31, 2022
Page 6

F.R.D. at 476. "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement." *Id*.

Courts evaluating whether FLSA settlements are reasonable consider the following factors:

(1) the plaintiffs' range of possible recovery;
(2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses;
(3) the seriousness of the litigation risks faced by the parties;
(4) whether the settlement is the product of arm's-length bargaining between experienced counsel; and
(5) the possibility of fraud or collusion.

*Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 336 (S.D.N.Y. 2012). *See also Fisher*, 948 F.3d at 599-600 ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky*…."). Importantly, under the Second Circuit's recent *Fisher* decision, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Fisher,* 948 F.3d at 606.

### a. Application of the *Wolinsky* Factors to the Settlement

As discussed below, the proposed Settlement is fair and reasonable to Plaintiffs and Defendant.

### i. Plaintiffs' Possible Range of Recovery

The Settlement results in a non-reversionary **$18,073,744.90** Net Settlement Fund for the 1,740 Plaintiffs. Plaintiffs believe the Net Settlement Fund, which is the amount to be distributed to the Plaintiffs after fees, expenses and Service Awards are deducted, is equal to 62.54% of Plaintiffs' total claimed damages on their best day in Court using a full three-year recovery period and a full award of liquidated damages. McGillivary Decl., ¶ 11. The average net settlement amount to the 1,740 individual Plaintiffs is **$10,389.80**. *Id.*

Considering the risks associated with establishing that the *Foster* decisions on liability and use of representative testimony at trial should apply to the claims in this matter and with establishing collective-wide damages, this amount is certainly reasonable. *See Rojas v. Pizza Pete's LLC*, 2019 U.S. Dist. LEXIS 149717, 2019 WL 4447578, at *5 (net settlement of 36% of total alleged damages after deducting costs and counsels' 1/3 contingency fee is "clearly reasonable given the uncertainties inherent in any litigation"); *Chowdhury v. Brioni America, Inc.*, 2017 WL 5953171, at *2 (S.D.N.Y. 2017) (net settlement of 40% of FLSA plaintiffs' maximum recovery is reasonable); *Redwood v. Cassway Contracting Corp.*, 2017 WL 4764486, at *2 (S.D.N.Y. 2017) (net settlement of 29.1% of FLSA plaintiffs' maximum recovery is reasonable); *Felix v. Breakroom Burgers & Tacos*, 15 Civ. 3531, 2016 U.S. Dist. LEXIS 30050, 2016 WL 3791149 at *2 (S.D.N.Y. 2016) (net settlement of 25% of FLSA plaintiff's maximum recovery is reasonable).

Hon. Paul G. Gardephe
October 31, 2022
Page 7

The Backpay Amount and liquidated damages are based on damages calculations prepared by Plaintiffs' expert damages witness, Dr. Louis Lanier, which were reviewed by Defendant's expert witness, Dr. Christopher Erath, as part of the Parties' arms-length negotiations. Plaintiffs believe that the Backpay Amount and liquidated damages reflected in the chart below equal 88.78% of Plaintiffs' total claimed damages on Plaintiffs' best day in court.

Notably, the Backpay Amount is based on a ***three-year statute of limitations*** on all claims. Ex. 1, ¶ 2.5. To achieve this outcome at trial, Plaintiffs would have been required to prove that Defendant willfully violated the law; otherwise, a two-year statute of limitations would apply. 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

The chart below demonstrates one way of evaluating the value of the Backpay Amount and liquidated damages on a claim-by-claim basis:

| Claim | Back Pay | Liquidated Damages |
|---|---|---|
| Regular Rate Claim | $204,495 | $204,495 (100%) |
| Straight Time Claim | $129,321 | $129,321 (100%) |
| Late Payment of Overtime | | $857,662 (85%) |
| Pre- and Post-Shift Overtime Claim (up to 30 minutes per day) | $1,355,607 | $1,220,046 (90%) |
| Meal Period Claim (2 hours and 40 minutes per week for missed meals) | $12,254,544 | $9,301,199 (75.9%) |

Notably, this settlement uses the exact same mathematical formulas used in *Foster*, meaning that the *Williams* Plaintiffs obtained the same legal outcome as the *Foster* Plaintiffs and benefited directly from the extensive discovery, motions practice, and legal decisions obtained by Plaintiffs in the *Foster* matter.

A discussion of the Backpay Amount and the associated litigation risks with respect to each claim is set forth below.

***Full Relief on the Regular Rate and Straight Time Claims.*** In *Foster,* Plaintiffs were granted summary judgment on liability on the Regular Rate Claim and the Straight Time Claim. Given that the claims stem from the same pay practices, Plaintiffs are confident the *Foster* decision would have controlled on these claims, leaving a jury to decide the amount of backpay owed as a result of these violations, as well as whether a three-year or two-year recovery period applied. The Court would have then determined whether liquidated damages were owed. In this matter, the amounts listed above account for three years of full backpay damages on these claims, as well as a full award of liquidated damages equal to the backpay. The calculation of damages for these, and all other claims, was based on the Defendant's payroll and timekeeping data for all Plaintiffs.

***Late Payment of Overtime Claim.*** On Plaintiffs' Late Payment of Overtime Claim, which would require Plaintiffs to prove at trial that Defendant, and not Plaintiffs, caused a delay in the payment for approved overtime work, the Settlement represents liquidated damages equaling 85% of the amount Plaintiffs sought to recover at trial. The damages associated with the Late Payment of Overtime Claim are liquidated damages to compensate Plaintiffs for the delayed, but eventual,

Hon. Paul G. Gardephe
October 31, 2022
Page 8

payment for the overtime work. Accordingly, payment of $857,662.00 equals 85% of the maximum possible recovery on this claim. Plaintiffs faced risk at trial on this claim because it required Plaintiffs to prove it was Defendant's actions, and not Plaintiffs' (e.g., by failing to timely submit requests for overtime work), that resulted in delayed payment.

*Uncompensated Pre- and Post-Shift Overtime Claim.* In *Foster*, Plaintiffs were granted summary judgment on liability on this claim, which left the jury to determine the amount of time Plaintiffs spent performing work before and/or after their paid shifts. Exactly as in *Foster*, the settlement amount associated with the Pre- and Post-Shift Overtime Claim in this matter was calculated based on the time recorded in the CityTime timekeeping system up to thirty minutes per day total. For example, if the CityTime data reflected that a Plaintiff worked an additional 30 minutes of uncompensated time on all 5 days in a workweek, 150 minutes (30 minutes multiplied by 5 days) of backpay overtime damages were assigned for that workweek for this claim. Additionally, the Settlement includes an amount equal to 90% of the backpay amount as liquidated damages on the Pre- and Post-Shift Overtime Claim. Plaintiffs faced risk on this claim because Plaintiffs carry the burden of proving the amount of uncompensated overtime work performed.

*Meal Period Claim.* In *Foster*, Plaintiffs were granted summary judgment on liability on this claim, which left the jury to determine the amount of time Plaintiffs spent performing work during their unpaid meal periods. Exactly as in *Foster* settlement, the settlement here represents full backpay on the Meal Period Claim for 2 hours and 40 minutes per week for each week of the recovery period for each Plaintiff. Additionally, the Settlement includes an amount equal to 75.9% of the backpay as liquidated damages on the Meal Period Claim.

Notably, Plaintiffs faced the greatest risk on the Pre- and Post-Shift Overtime and Meal Period Claims because, while the *Foster* decisions would likely control on issues of liability, discovery would likely have been necessary on the ***amount*** of uncompensated overtime work performed by the Plaintiffs in this case. On these claims, Plaintiffs carry the burden of proving the amount of time they worked through their unpaid meal periods each workweek, and that the time captured in CityTime as uncompensated pre- and post-shift minutes represented worktime.

Moreover, for the Pre- and Post-Shift Overtime and Meal Period Claims, if Plaintiffs were successful in meeting their burden of proof, it is possible that a jury could have awarded fewer minutes per day of pre- or post-shift overtime, or fewer minutes per week in unpaid meal periods. Significantly, even if a jury ruled in Plaintiffs' favor, a jury may have found that these violations were not willful, resulting in a two-year rather than three-year recovery period, and it is possible that the Court may not have awarded liquidated damages.

In light of this range of recovery as compared to the amounts provided for under the Agreement, this Settlement represents an excellent result for the Plaintiffs on ***all*** claims. **Moreover, this exact settlement formula was approved by the Court as fair and reasonable in the *Foster* case**. *Foster,* Dkt. 242

Hon. Paul G. Gardephe
October 31, 2022
Page 9

### ii. Avoiding Anticipated Burdens and Expenses

Litigating FLSA claims and damages would be a fact-intensive process demanding additional costly litigation for both Parties. Even assuming the *Foster* decision would control some, if not all, of the liability issues in this case, without this Settlement, both Parties would need to spend significant time and resources briefing the issue of whether the legal rulings in *Foster* would be applicable and the claims to which the decisions would apply; preparing for and taking discovery related to the amount of uncompensated work performed by Plaintiffs; and preparing for and participating in a multi-week trial. Absent settlement, the anticipated burdens and expenses on both Parties were significant.

### iii. Seriousness of Litigation Risks

As noted above, there was risk to both sides regarding the implications of the legal rulings in *Foster* and the jury's determinations of the amount of uncompensated work performed on the claims that result in the most significant damages to the Plaintiffs: Plaintiffs' Pre- and Post-Shift Claim and Meal Period Claim, as well as the issues of whether the Defendant's violations on all claims were willful and lacked good faith or reasonableness. Given the uncertainty over the potential outcome, both Parties were motivated to settle this dispute.

### iv. Arm's-Length Bargaining

Both Parties engaged in good faith, arm's-length negotiation in reaching this Settlement. Counsel for the Parties negotiated settlement terms over the course of several months, until a tentative settlement was reached. Plaintiffs' expert witness analyzed detailed payroll information and timekeeping records and shared those calculations and all underlying programing with Defendant. Defendant's expert reviewed and analyzed Plaintiffs' damages calculations, and these calculations were relied upon by the Parties to negotiate the settlement amount.

Ultimately, the Parties reached an agreement in principle and the settlement terms were then approved by the Plaintiffs' Settlement Team. In addition, all Plaintiffs have been informed of the Settlement and its terms, and they have been informed of their opportunity, if they so choose, to object to the settlement terms on an individual basis. In addition, they were informed of the Settlement distribution methodology and the point value. They had an opportunity to dispute the number of recovery period weeks assigned to them, and to review the amounts and weeks allocated to each and every Plaintiff, including the Service Awards.[5] **To date, no Plaintiff has lodged any objection to the Settlement.**

### v. Possibility of Fraud or Collusion

Given this hard-fought battle over the course of nearly ***eight years*** on the *Foster/Williams* litigation, and the Parties' arms-length negotiating and their good faith participation in settlement

---

[5] As previously mentioned, Plaintiffs have until November 11, 2022, to dispute the points allocated to them.

Hon. Paul G. Gardephe
October 31, 2022
Page 10

discussions with the assistance of the Court at three settlement-related status conferences, there was no opportunity for fraud or collusion. The Parties represented their clients zealously and obtained what both Parties consider to be a fair and reasonable Settlement consistent with standards established in the Second Circuit for FLSA collective action settlements.

### b. The Service Awards to the Settlement Team Plaintiffs are Appropriate[6]

Courts in this Circuit have recognized that, "[i]n FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *See, e.g., Sanz v. Johnny Utah 51 LLC*, 2015 WL 1808935 (S.D.N.Y. 2015) (quoting *Diaz v. Scores Holding Co., Inc.*, 2011 U.S. Dist. LEXIS 112187, 2011 WL 6399468 at *3-4 (S.D.N.Y. 2011)).

The Service Awards will be provided to the three Settlement Team members who also served as lead plaintiffs and assisted in settlement discussions, ultimately approving this Settlement and recommending the Settlement to the collective. McGillivary Decl., ¶ 13. The Service Awards **total $4,500** and are approximately 0.017% of the **$25,856,690.00** Settlement Amount. All 1,740 Plaintiffs have been informed of these payments, and none have objected to the Service Awards. McGillivary Decl., ¶ 13.

The Settlement Team spent time gathering facts for the initial Complaint, participating in the settlement discussions, reviewing damages calculations, assessing the various settlement scenarios and facilitating in recommending a settlement to the other Plaintiffs. Thus, the time and effort exerted by the Settlement Team resulted in a significant benefit to the collective. *Id*. The Settlement Team's willingness to serve the collective achieved favorable results for 1,737 additional Plaintiffs (e.g., median individual settlement amount is $10,389.80 *after* fees, expenses, and Service Awards are deducted). *Id.* Under well-established Second Circuit precedent, the Settlement Team members are entitled to the Service Awards sought in this Settlement.

### c. Attorneys' Fees and Costs[7]

Each of the 1,740 Plaintiffs signed a written contract in which they agreed to a 30% contingency fee when they retained the law firms handling this case. McGillivary Decl., ¶ 14. Accordingly, under the Settlement Amount, after expenses in the amount of $30,625.85 are reimbursed, Plaintiffs' Counsel will be paid $ 7,747,819.25, which represents a 30% contingency fee of the Settlement net of costs. *See Run Guo Zhang v. Lin Kumo Japanese Rest., Inc.*, 2015 WL

---

[6] Defendant takes no position regarding the Service Awards provided to the Settlement Team as these Awards are made pursuant to agreements solely between Plaintiffs and their Counsel.

[7] As described in the Settlement Agreement, each of the Plaintiffs has entered into individual agreements with Plaintiffs' Counsel that contain contingency fee provisions. The Defendant is not a party to these agreements. As such, Defendant takes no position regarding Section III(c) of this letter.

Hon. Paul G. Gardephe
October 31, 2022
Page 11

5122530 at *1 (S.D.N.Y. 2015) ("The Court's view is that attorneys' fees, when awarded on a percentage basis, are to be awarded based on the settlement net of costs.").

#### i. Percentage of the Fund Awards Are Favored and the Amount Sought in this Matter is Similar to Court-Approved Fees in Similar Percentage of the Fund Cases

The Second Circuit favors the use of the contingent percentage of the fund method to compensate attorneys in overtime wage and hour actions. *See, e.g., McDaniel v. County of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010); *Wal-Mart Stores, In. v. Visa U.S.A., Inc.* 396 F.3d 96 (2d Cir. 2005). The reasoning behind this is straightforward: "[T]he percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Monserrate v. Tequipment, Inc.*, 2012 WL 5830557 at *3 (E.D.N.Y. 2012). That "powerful incentive" is the very real possibility that plaintiffs' counsel will not recover any fees whatsoever. *Butt v. Megabus Ne. LLC*, 2012 U.S. Dist. LEXIS 137683 at *22 (S.D.N.Y. 2012) ("Class Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation. [Therefore, a] percentage-of-recovery fee award of 33.3% is consistent with the Second Circuit's decision").

"Attorneys who fill the private attorney general role must be adequately compensated for their efforts. If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. Adequate compensation for attorneys who protect wage and hour rights furthers the remedial purposes of the FLSA and NYLL." *DeLeon v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 65261, 2015 WL 2255394 at * 5 (S.D.N.Y. 2015) (FLSA and New York labor law claims) (citing *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 51 (2d Cir. 2000), for "commending the general 'sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.'"). *See Bozak v. FedEx Ground Package Sys.,* 2014 WL 3778211, at *16 (D. Conn. 2014) ("Fee awards in wage and hour cases are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel."); *Capsolas v. Pasta Resources Inc.,* 2012 WL 4760910, at *8 (S.D.N.Y. 2012) (fee request of one-third is "consistent with the norms of class litigation in this circuit"). As such, evaluating the amount of fees provided for in a settlement agreement using the "percentage-of-recovery" method is consistent with the "trend in this Circuit." *Bannerman v. Air-Sea Packing Grp.*, 2020 WL 408350, at *3 (S.D.N.Y. 2020) (approving attorneys' fees of 33 1/3%).

#### 1. Private Fee Agreements Should be Honored

Consistent with the Second Circuit's disposition toward contingency fee agreements is its favorable position toward private fee agreements. By enforcing such agreements, the Court provides low income and individual plaintiffs with a powerful tool for enforcing their rights. As the Supreme Court has explained in the civil rights context, "[Nothing] in the legislative history … persuades us that Congress intended § 1988 to limit civil rights plaintiffs' freedom to contract with their attorneys." *Venegas v. Mitchell*, 495 U.S. 82, 87 (1990). This is because "depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in

Hon. Paul G. Gardephe
October 31, 2022
Page 12

civil rights cases to secure competent counsel." *Id*. at 89-90. Therefore, the fee-shifting provision of § 1988 "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Id*. at 90.

The same holds true in the fee shifting context of the FLSA. *See, e.g., Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 141 n.4 (2d Cir. 2007) (in ADEA case, which incorporates same fee-shifting provision as FLSA, Court concluded that attorney and client should be able to settle distribution of the attorney's fees "according to their own contract terms, which are beyond the province of this Court."); *Samaroo v. Deluxe Delivery Sys*., 2016 U.S. Dist. LEXIS 34742, 2016 WL 1070346 at *9 n.4 (S.D.N.Y. 2016) (approving attorneys' fees and costs of more than 34% of the settlement, noting that "I do not address the fee arrangement between plaintiffs and their counsel because I do not believe I am required to do so under *Cheeks*. As described in *Cheeks*, the purpose of the FLSA is to regulate the relationship between an employee and his employer and to protect the employee from over-reaching by the employer. I do not understand the FLSA to regulate the relationship between the employee as plaintiff and his counsel or to alter the freedom of contract between a client and his attorney."); *Chowdhury*, 2017 U.S. Dist. LEXIS 196469, 2017 WL 5953171 at *15-16 ("Finally, pursuant to a retainer agreement signed by plaintiffs, plaintiffs' counsel will receive one third of the settlement proceeds, exclusive of counsel's out-of-pocket costs, for contingency fees. Contingency fees of one-third in FLSA cases are routinely approved in this Circuit.").

Moreover, courts in this Circuit recognize that where small claims can only be prosecuted through aggregate litigation, such as in the instant FLSA case, attorneys who fill the "private attorney general" role must be compensated for their efforts through enforceable contingent fee agreements. *See, e.g., Viafara v. MCIZ Corp.*, 2014 WL 1777438 at *27-28 (S.D.N.Y. 2014) (approving 33 1/3 % fee consistent with norms of fee shifting litigation in Second Circuit); *Zeltser v. Merrill Lynch & Co*., 2014 WL 4816134, at *9 (S.D.N.Y 2014) (same); *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 WL 3778173, at *4 (S.D.N.Y. 2014) (same); *Clem v. KeyBank, N.A*., 2014 WL 2895918, at *10-11 (S.D.N.Y. 2014) (same). Indeed, many individual litigants, including the Plaintiffs here, likely "cannot afford to retain counsel at fixed hourly rates . . . yet they are willing to pay a portion of any recovery they may receive in return for successful representation." *deMunecas v. Bold Food, LLC*, 2010 U.S. Dist. LEXIS 87644, 2010 WL 3322580 at *21-22 (S.D.N.Y. 2010) (quoting *In re Abrams*, 605 F.3d 238, 245-46 (4th Cir. 2010)).

Here, each of the 1,740 Plaintiffs entered into a private fee agreement to pay their "private attorneys general" a 30% percent contingency fee.[8] The agreement provides:

In consideration of the services of [McGillivary Steele Elkin LLP], and other such law firms with whom they deem necessary to work on my case such as Spivak Lipton, LLP of New York City, I agree to pay such attorneys 30% (thirty percent)

---

[8] A copy of the contingency fee agreement signed by Jacqueline Williams (with Personally Identifiable Information redacted) is attached to the Declaration of Gregory K. McGillivary as Exhibit A. This is the same agreement each of the 1,740 Plaintiffs signed and is the same agreement that the plaintiffs in the *Foster* case signed.

Hon. Paul G. Gardephe
October 31, 2022
Page 13

of my total gross recovery (inclusive of attorneys' fees recovered from defendants) as attorneys' fees.

Additionally, there are no "absent" class members in this case. Instead, all 1,740 Plaintiffs knew about the 30% contingent fee at the start of the case, signed a contract agreeing to pay it, and have been informed about the amount they will now pay once the Court approves the settlement. **No Plaintiff has objected to the fees or expenses.** For all of these reasons, this Court should "enforce the parties' intentions in a contingent fee agreement, as with any contract." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).

### 2. The Attorneys' Fees Sought in This Matter are in Line with Settlements of Similar Size, Complexity and Subject Matter

As courts in this circuit have repeatedly recognized, "When using a 'percentage of the fund' approach, 'courts regularly approve attorney's fees of one-third of the settlement amount in FLSA cases.'" *Xiao v. Grand Sichuan Intn'l St. Marks, Inc.*, 2016 U.S. Dist. LEXIS 99669, 2016 WL 4074444 at *3 (S.D.N.Y. Jul. 29, 2016) (citing *Meza v. 317 Amsterdam Corp.*, 2015 U.S. Dist. LEXIS 166890, 2015 WL 9161791 (S.D.N.Y. Dec. 14, 2015)). *See Bryant v. Potbelly Sandwich Works, LLC*, 2020 U.S. Dist. LEXIS 21900, 2019 WL 1915298, at *15 (S.D.N.Y. Feb. 4, 2020) (in FLSA/Rule 23 hybrid, approving one-third of common settlement fund as "reasonable and well within the accepted range awarded in wage and hour cases in this District and throughout the Second Circuit"); *Cruz v. Sal-Mark Rest. Corp.*, 2019 U.S. Dist. LEXIS 13529, 2019 WL 355334 at *21 (N.D.N.Y. Jan. 28, 2019) (approving one-third fee, noting that a "presumptively reasonable fee takes into account what a reasonable, paying client would pay" and this "supports a one-third (33.33%) recovery in a case like this one where Class Counsel's fee entitlement is entirely contingent upon success"); *Chung v. Brooke's Homecare LLC*, 2018 WL 2186413, at *3-4 (S.D.N.Y. 2018) (awarding one-third fee, noting that "Courts routinely award 33.33% of a settlement fund as a reasonable fee in FLSA cases"); *Penafiel v. Babad Mgmt. Co., LLC*, 2018 U.S. Dist. LEXIS 66991, 2018 WL 1918613 at *9 (S.D.N.Y. Apr. 18, 2018) (awarding 33.3% fee, noting "Contingency fees of one-third in FLSA cases are routinely approved in this Circuit").

Not only is the contingent fee of 30% sought in this matter (1) ***lower*** than the norm of one-third typically awarded in this Circuit, (2) consistent with fees in wage and hour cases in this Circuit, and (3) what each of the Plaintiffs agreed to pay at the outset of this litigation, but the attorneys' fees requested here are also in line with other settlements of a similar size, complexity and subject matter. Here, after deducting attorneys' fees and expenses, the Plaintiffs are recouping ***62.54% of their total possible recovery if they were fully successful on all issues*** (and after which they would still be responsible for paying a contingent fee). *See e.g., Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178, 185-86 (W.D.N.Y. 2011) (awarding $14 million dollars in attorneys' fees, representing one-third of $42 million settlement fund in a Rule 23/FLSA hybrid involving "thousands of class members"); *Worley v. City of New York*, Case No. 17-cv-04337-LGS, Dkt. 230 (S.D.N.Y. Jun. 8, 2020) (approving one-third contingency fee of $9,197,682.07 in FLSA collective action from settlement totaling $27,747,075.22 where the average net settlement amount to the 3,880 Plaintiffs was $4,726.38); *Yuzary v. HSBC Bank USA, N.A.*, 2013 U.S. Dist. LEXIS 144327, at *24 (S.D.N.Y. Oct. 2, 2013) (Gardephe, J.) (approving requested attorney's fee of $4,953,125, representing 31.7% of the settlement fund of $15,625,000 in FLSA/Rule 23 hybrid

Hon. Paul G. Gardephe
October 31, 2022
Page 14

settlement); *Hart v. RCI Hosp. Holdings*, 2015 U.S. Dist. LEXIS 126934, 2015 WL 557713 at *5, *11, *44 (S.D.N.Y. 2015) (approving requested attorneys' fee of $4,928,949.74 representing 32.9% of the gross settlement amount of $15 million in 2,208-member FLSA/Rule 23 hybrid reversionary settlement where the average payment assuming full participation of the class was $4,255).

"[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Fisher*, 948 F.3d at 606 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)) (internal quotation marks omitted). Indeed, as the cited cases make clear, the contingent fee percentage being paid by the Plaintiffs is *less* than contingent fees paid in cases of similar size. The average net award in this case is more than $10,300.00 per Plaintiff even after the contingent fee is paid, which is more than the awards recovered in cases of similar size. In short, the result for Plaintiffs is outstanding.

### ii.   The Fee is Reasonable Based on "Traditional Criteria"

In determining a reasonable award of attorneys' fees, this Court will also consider the "traditional criteria" such as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement and (6) public policy considerations. *Goldberger*, 208 F. 3d 43, 50 (2d Cir. 2000) (internal quotations omitted).  An analysis of these criteria further supports the fee requested.

### 1.   The Litigation was Complex

"The size and difficulty of the issues in a case are significant factors to be considered in making a fee award." *Sukhnandan*, 2014 U.S. Dist. LEXIS 105596, 2014 WL 3778173 at *10. Here, given the size of the collective and the sophistication of the employer and its policies, the Defendant's claimed defenses, and the sheer volume of work involved in litigating this matter over several years, first in the *Foster* litigation, and subsequently in resolving the *Williams* plaintiffs' claims based on the *Foster* framework, this case did not represent a straightforward FLSA claim where a single employee seeks compensation for an easily defined amount of unpaid work. It involved more than 1,700 Plaintiffs, working across five boroughs for the City's Administration for Children's Services. As a result, this litigation was complex, and Plaintiffs' Counsels' expertise greatly benefitted the 1,740 plaintiffs.

To start, the case involved a thorough investigation by Plaintiffs' Counsel to determine the extent of the violations, and to verify that the *Williams* Plaintiffs suffered the same violations as the *Foster* plaintiffs. McGillivary Decl., ¶ 16. Shortly after the case was filed, on March 7, 2017, the Parties jointly moved to stay this case because they agreed that the Court's decision in the *Foster* litigation on the Parties' motion for summary judgment would "affect the manner in which [Williams] proceeds." Dkt. 25. The Court granted the motion to stay. Dk. 26. After the summary judgment decision in *Foster* finding in Plaintiffs' favor on several liability issues, there was subsequent extensive litigation on numerous issues, including a trial plan in which Defendant proposed that the *Foster* and *Williams* matter be tried together. McGillivary Decl., ¶ 17. Additionally, Defendant attempted to certify an interlocutory appeal on the issue of whether Plaintiffs' Counsel should be prohibited from representing Plaintiffs in the title of CPS and CPSS,

Hon. Paul G. Gardephe
October 31, 2022
Page 15

and Plaintiffs' Counsel defeated that motion, preserving the right to represent the CPS and CPSS titles in *Williams*. McGillivary Decl., ¶ 19. Moreover, the Parties litigated the issue of whether the identical claims in *Foster* could be tried through representative testimony, a decision which again benefited the *Williams* Plaintiffs because the Court's decision was based on the fact that the City maintained a policy or practice which violated the FLSA, thus permitting collective treatment. McGillivary Decl., ¶ 20. Additionally, the Parties engaged in extensive expert discovery in *Foster* and here, in which the Plaintiffs' expert created damages calculations relied on by the Parties to settle *Foster*, and then *Williams*. McGillivary Decl., ¶ 21. Lastly, Plaintiffs' Counsel conducted an extensive, independent fact investigation involving interviewing dozens of *Williams* Plaintiffs to validate the claims in this matter and to determine that there were no changes in work practices and/or workload. McGillivary Decl., ¶ 22.

Taken together, the magnitude of Plaintiffs' claims and the posture of this litigation was complex and required significant effort and expertise by Plaintiffs' Counsel to advance Plaintiffs' claims and reach a favorable outcome.

## 2. The Time and Labor Required

During more than eight years spent litigating the *Foster/Williams* cases, Plaintiffs' Counsel performed substantial, complex work, with significant risk of not being paid for any of this time in the event the claims were unsuccessful. This work included: (1) interviewing Plaintiffs and investigating claims; (2) preparing and filing the Complaint; (3) attending court conferences; (4) opposing the Defendant's Motion to Disqualify counsel in *Foster*; (5) negotiating a *Foster* discovery plan with Defendant that would have controlled discovery in this matter; (6) engaging in extensive discovery in *Foster* that would have been utilized in this matter given that this matter involves identical claims including: preparing written discovery to Defendant; filing a Motion to Compel documents related to Defendant's good-faith defense; noticing Rule 30(b)(6) depositions on 48 sub-topics; preparing for Rule 30(b)(6) depositions; taking Rule 30(b)(6) depositions; taking management witness depositions; engaging an expert witness to prepare damages calculations by analyzing millions of lines of data; analyzing the report of Defendant's expert witness; taking and defending expert witnesses' depositions; (7) extensive motions practice in *Foster* that would govern the legal issues in this matter, including: drafting the summary judgment briefing and opposition and preparing supporting documents; drafting an Opposition to Defendant's attempt to certify an interlocutory appeal; drafting an extensive proposed trial plan; drafting the similarly situated briefing; drafting a response to the Defendant's objections to the Magistrate Judge's similarly situated Report and Recommendation; (8) preparing this case for settlement readiness soon after the lifting of the stay by negotiating a settlement-related discovery plan; (9) working with Plaintiffs' expert to prepare settlement calculations and to respond to challenges to the *Foster* settlement framework by defense counsel; (10) engaging in extensive settlement discussions, including conferences with the Settlement Team; (11) negotiating the written terms of the Settlement Agreement; (12) notifying 1,740 Plaintiffs of the terms of the Settlement Agreement; (13) responding to questions regarding the Settlement; (14) preparing Settlement approval papers; and (15) preparing for administration of the Settlement. McGillivary Decl., ¶ 23; Pordy Decl., ¶ 14.

Hon. Paul G. Gardephe
October 31, 2022
Page 16

All of the *Foster* work was necessary to obtain the excellent results in *Williams*. Plaintiffs' Counsel are entitled to the contingency fee they agreed to with their clients in this matter given all of the above reasons and given that the *Williams* settlement would not have been possible without the extensive work put into *Foster* as well as the additional legal work that was necessary to ensure that the *Williams* Plaintiffs were similarly situated to the *Foster* Plaintiffs with respect to the strength of their claims.

### 3. The Fee in Relation to the Settlement Fund is Reasonable

The cases cited in Section III.c.i confirm the reasonableness of the requested fee, as it is consistent with other FLSA cases in this Circuit, and indeed, is below the presumptively reasonable one-third that is typically approved in this Circuit. Moreover, in this case, each of the 1,740 individual Plaintiffs determined that the fair market rate for Plaintiffs' Counsel was 30% of the funds recovered, and thus awarding attorneys' fees consisting of that amount is warranted.

### 4. The Risk of Litigation

Plaintiffs' Counsel undertook to prosecute the *Foster/Williams* litigation without any guarantee of payment and litigated on a contingent basis including the advancement of all the expenses of the litigation. Plaintiffs' Counsel was required to make a significant investment of time and resources without a guarantee of payment of any kind. The success of such off-the-clock/unpaid work time cases on a class wide basis involving 1,740 employees would have been hard fought at trial by Defendant, especially considering that the City asserted that there was a basis for distinguishing the *Williams* Plaintiffs from the *Foster* Plaintiffs. Even if Plaintiffs were successful at trial, Defendant would have attempted to move for judgment as a matter of law and/or to decertify the collective at trial. Appeals would have surely followed. Accordingly, Plaintiffs' Counsel faced significant obstacles to recovery for the entire class on all claims absent settlement, despite the outcome of the *Foster* case.

### 5. The Quality of Representation

As described fully in the Declarations of Gregory K. McGillivary and Hope Pordy, Plaintiffs' Counsel are nationally recognized experts in the FLSA and wage and hour law, and their expertise greatly benefited Plaintiffs. For example, Mr. McGillivary has litigated hundreds of FLSA cases and is the author of the government chapter in the treatise "The Fair Labor Standards Act," E. Kearns, and Plaintiffs benefited from this level of expertise. McGillivary Decl., ¶¶ 6. *See also* McGillivary Decl., ¶¶ 5-10; Pordy Decl., ¶¶ 7-12.

### 6. Public Policy Weighs in Favor of Approving the Fee

As described above, the risk in this case was high and the work performed by Plaintiffs' Counsel significant. Plaintiffs' case was hardly "run of the mill," in that Plaintiffs presented claims based on common policies and practices justifying representative treatment at trial. *See Foster* Dkt. 225. In doing so, as this Court noted in *Foster*, Plaintiffs proceeding collectively with the assistance of counsel "furthers the goal of collective actions recognized by the Second Circuit, because it permits employees earning modest wages to efficiently vindicate their rights by the pooling of

Hon. Paul G. Gardephe
October 31, 2022
Page 17

resources." *Id.* at 11. Plaintiffs respectfully submit that this collective treatment advances the broad remedial public policy purposes of the FLSA.

### d. Approval of Plaintiffs' Counsels' Expenses is Warranted

Under the Settlement, Plaintiffs' Counsel will be reimbursed for $30,625.85 in out-of-pocket expenses. A breakdown of the expenses incurred by McGillivary Steele Elkin LLP is attached to the Declaration of Gregory McGillivary as Exhibit B. A breakdown of the expenses incurred by Spivak Lipton LLP is attached to the Declaration of Hope Pordy as Exhibit A. Counsel are entitled to reimbursement of litigation expenses from the Settlement fund. 29 U.S.C § 216(b). Plaintiffs' Counsels' expenses, including experts, copying, printing, and mailing were reasonable and necessary to counsel's representation of Plaintiffs. *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 390 (S.D.N.Y. 2017) (awarding expenses for experts, copying, electronic research, travel and printing, and other out-of-pocket expenses).

### IV.   Conclusion

For all of the above reasons, the Parties believe that this Settlement is a favorable outcome and will appropriately compensate Plaintiffs for the overtime pay issues that are the subject matter of this litigation. Accordingly, the Parties respectfully submit that the Settlement, in its entirety, is fair and reasonable and should be approved by the Court.

Sincerely,

MCGILLIVARY STEELE ELKIN LLP

/s/ Gregory K. McGillivary
Gregory K. McGillivary

cc:    All Counsel (via ECF)